## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF INDIANA



NOV 08 2021

At _____ M
GARY T. BELL, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | **2 : 21 CV 346** |
| Plaintiffs, | |
| *Ex rel.*, | |
| [UNDER SEAL], | **COMPLAINT** |
| Plaintiff-Relator, | **Filed Under Seal pursuant to the False Claims Act, 31 U.S.C. §§ 3729-32 and other similar state statutory provisions** |
| v. | |
| [UNDER SEAL], | |
| Defendants. | **JURY TRIAL DEMANDED** |

**FILED IN CAMERA AND UNDER SEAL**

UNITED STATES OF AMERICA and
the State of INDIANA,

                Plaintiffs,

                *Ex rel.*,

CHARLES E. WADE,

                Plaintiff-Relator,

      v.

MARION HEALTH, SIRAJABID A. KHATIB,
M.D., TONY ROBERTS, STEPHANIE HILTON-
SIEBERT, SHANKARAN SRIKANTH, M.D.,
VAHID D. SEDAGHAT, M.D., and SARAH
SEWARD

                Defendants.

**– FILED –**

NOV 0 8 2021

At _____ M
GARY T. BELL, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

**2 : 21 CV 346**

**ORIGINAL COMPLAINT**

**Filed Under Seal pursuant to the False
Claims Act, 31 U.S.C. §§ 3729-32 and
other similar state statutory
provisions**

**JURY TRIAL DEMANDED**

## I.   **INTRODUCTION**

1.      Two thirds of Defendant Marion Health's ("MGH")[1] revenue is derived from Medicare and Medicaid, and despite hundreds of millions of dollars paid to Defendant by the Federal Government, Defendant claims that it receives less reimbursement from Medicare than it costs to provide the services.[2] And so – for years – Defendants have orchestrated a calculated scheme to skim extra government health care dollars by billing services provided by nurse practitioners (NPs or NPPs) and physician assistants (PAs) at the higher billing rate reserved for physicians. Relator Charles Wade – a Hospitalist Nurse Practitioner – learned of this scheme in October 2020, roughly 6 months after he began working for MGH. The wrongful conduct alleged herein is ongoing.

2.      The Centers for Medicare & Medicaid Services ("CMS") maintains a fee schedule for physician services. Pursuant to 42 U.S.C. § 1395l(a)(1), CMS compensates NPs and PAs at 85 percent of the physician fee schedule rates. Where nurse practitioners and PAs collaborate with physicians and treat the same patients, a hospital may bill the nurse practitioner at the physician rate if strict rules are followed. Specifically, under the "Title of Split/Shared E/M Service,"[3] the Medicare Claims Processing Manual ("Claims Manual") provides that a hospital may bill a nurse

---

[1] Marion Health was known as Marion General Hospital prior to a formal name change on October 1, 2021, and the hospital was referred to colloquially as MGH for the majority of the period. For ease of reference, Relator refers to the entity as "MGH" throughout the remainder of the Complaint.

[2] *See*, Marion General Hospital Financial Statements, June 30 2018 and 2017 at p. 20, available at: https://www.in.gov/health/files/2018-Marion-General-Hospital-AFS.pdf (accessed Oct. 28, 2021) reflecting portion of revenue derived from Medicare and Medicaid; Explanation from MGH 2019 Form 990 at p. 46 (stating that "SERVICES ARE PROVIDED TO MEDICARE PATIENTS BY MGH WHILE, AT THE SAME TIME, WE FULLY EXPECT TO RECEIVE LESS IN REIMBURSEMENT THAN IT COSTS TO PROVIDE THESE SERVICES.")                              (available                              at: https://projects.propublica.org/nonprofits/display_990/350868130/05_2021_prefixes_34-35%2F350868130_202006_990_2021052018152365, accessed Nov. 2, 2021).

[3] E/M stands for Evaluation & Management, the type of service that Wade provided to hospital patients.

practitioner's services under a physician's name and at a physician's rate only if (a) the physician conducted and documented a face-to-face visit that day, (b) the physician and nurse practitioner are employed by the same group, and (c) the service provided is evaluation and management.[4] The Claims Manual further cautions that "if there was no face-to-face encounter between the patient and the physician (e.g., even if the physician participated in the service by only reviewing the patient's medical record) then the service may only be billed under the NPP's UPIN/PIN."

3.      Notwithstanding CMS requirements, and despite internal complaints by the Relator, Defendants knowingly submitted claims for nurse practitioner and physician assistant services under physician NPIs, thus seeking and obtaining payment at the 100% rate, even when the physicians never examined those patients and were not present at the hospital when the NP or PA service was rendered.

4.      Relator Charles Wade, NP, began working for MGH in March of 2020.[5] By October 2020, he learned that Defendants routinely inflate nurse practitioner bills by altering the NPI number at the point of patient discharge even though nurse practitioners provide(d) the only services to patients.[6] For example, MGH routinely billed for Relator's services under the NPI of his physician collaborator Dr. Sirajabid A. Khatib even though Dr. Khatib did not conduct a face-to-face visit with that patient on the days Relator provided treatment. This wrongful practice was

---

[4] Medicare Claims Processing Manual, Ch. 12 §30.6.1.B. The appropriate rate payable for service rendered to a CMS beneficiary is automatically triggered by the National Provider Identifier ("NPI") submitted with the claim for reimbursement.

[5] During the course of his interviews in November and December 2019, Relator disclosed that he had discovered fraudulent activity in his prior employment at Witham Hospital and told Defendants that they should not hire him if fraudulent activity was also occurring at MGH. Relator even spoke to the MGH Board of Trustees about the fraud he had observed previously and again stated that MGH should not hire him if fraudulent conduct was taking place.

[6] As described further below, patient charts accurately reflect that the nurse practitioner was the treating provider during the patient's stay. After a patient's discharge, Relator routinely observed alterations to these records whereby an attending physician was listed as the treating provider so the higher physician's billing rate could be billed to Medicare.

not limited to Khatib; in the course of both his healthcare duties and his investigation of Defendants' billing schemes, Relator reviewed written information confirming that Defendants' wrongful conduct is pervasive; NPs – other than relator – who likewise independently treated patients were then billed under the NPIs of physician collaborators.

5.      When MGH learned that Relator had engaged in diligence to determine whether the government was falsely billed, it placed him on a paid suspension and attempted to get him to sign a separation agreement under which he would waive all potential claims – including those provided by the "Qui Tam" provisions of the False Claims Act – in return for being paid for his accrued "time off" ("PTO") to which he was already legally entitled.

6.       Subsequent to the paid suspension, and because Defendants had no intention of correcting their behavior or returning ill-gotten gains to the government, Relator resigned from MGH. Prior to his March 2021 resignation, Relator apprised MGH officials of his concerns but was told that notwithstanding the clear language of the Claims Manual, it was MGH's policy to bill under the physician collaborator NPI number at all times. Relator was told by relevant MGH administrators – as alleged herein – that this billing policy applied globally, including to MGH's nursing homes, home health care, primary care, outpatient clinic, urgent care and Emergency Department as well as the Hospitalist Department.

## II.    THE PARTIES

### A.    PLAINTIFF-RELATOR CHARLES E. WADE

7.      Plaintiff-Relator **Charles E. Wade ("Relator")** is a resident of Marion County, Indiana and a life-long resident of the State of Indiana. Relator has an Associate's Degree in Nursing from Harrison College in Indianapolis, a Bachelor's of Science degree from Western Governor's University in Indianapolis, and a Master of Science Degree ("MS") in Primary Care from Indiana Wesleyan University in Marion.  Relator is an NP licensed in Indiana; he worked for

Defendant Marion Health as a Hospitalist Nurse Practitioner from March 2020 to March 2021. His responsibilities as a Hospitalist NP for Defendant MGH included admissions/discharges, making rounds to check on assigned patients, collecting medical histories, conducting physical exams, ordering tests, and assessing and diagnosing acute and chronic illnesses.

**B.    DEFENDANTS**

8.    Defendant **Marion General Hospital, Inc.,** n/k/a **Marion Health** (a/k/a **MGH**) is a non-profit Indiana corporation with its principal place of business at 441 N. Wabash Avenue, Marion, IN 46952. MGH began operating in Grant County, Indiana in 1896 and was known as Marion General Hospital prior to a formal name change on October 1, 2021. Before MGH formed, there were many different small hospitals and doctor's offices around Marion and Grant County. While none of them provided centralized care, over time many were joined under the MGH corporate umbrella. Today, MGH is an acute care hospital with roughly 131 staffed beds, earning annual average revenue of more than half a billion dollars.[7] **Over two-thirds of MGH's revenue is derived from Medicare and Medicaid reimbursement.** Upon information and belief, MGH's acquisition of these smaller entities has increased MGH's overhead, through debt service or otherwise, requiring it to engage in efforts to meet economic demands. Moreover, while MGH is a classified under the Internal Revenue Code as a 501(c)(3) not for profit entity, its administrators are paid handsomely as alleged herein.

---

[7] In 2020, Marion Health's total patient revenue exceeded $500,000,000. *E.g.*
https://www.ahd.com/free_profile/150011/Marion_General_Hospital/Marion/Indiana/ (accessed Nov. 3, 2021). While some of its patients were not Medicare or government-insured patients and revenue was also generated by services and items not at issue, MGH has treated roughly 1,694 Medicare inpatients as of September 2021 (*id.*), and much of the revenue generated stems from the services provided by NPs and PAs fraudulently billing at physician rates. MGH's 2019 Form 990 lists more than two dozen other non-hospital practice locations operated by MGH including clinics, physician offices, labs, and a surgery center.

9.      Defendant **Sirajabid A. Khatib, M.D. ("Khatib")** is the Hospitalist Director and an internal medicine specialist at MGH. Khatib, a member of the MGH Board of Directors, purports to have more than 32 years of experience in the medical field and is a graduate of the Jim Medical College, Davangere, Rajjv Ghandi University of Health Sciences. According to MGH's 2019 Form 990, Dr. Khatib received in excess of $360,000 in compensation from MGH and related organizations. At all relevant times, Defendant Khatib was aware of – and allowed the use of – his NPI number to secure reimbursement from Medicare and Medicaid for services rendered to patients that Khatib never properly encountered.

10.      Defendant **Shankaran Srikanth, M.D. ("Srikanth")** is MGH's Chief Medical Officer ("CMO"). Srikanth is also a member of the MGH Board of Directors and a graduate of the M.S. Ramaiah Medical College. According to MGH's 2019 Form 990, Srikanth received nearly $460,000 in compensation from MGH and related organizations. Defendant Srikanth oversees nursing home care and serves as collaborator for nurse practitioners. At all relevant times, Defendant Srikanth was aware of – and allowed the use of – his NPI number to secure reimbursement from Medicare and Medicaid for services rendered to patients that Srikanth never properly encountered.

11.      Defendant **Vahid D. Sedaghat, M.D. ("Sedaghat")** is the Assistant Director of MGH's Hospitalist program. He is a graduate of the St. George's University School of Medicine in Grenada. At all relevant times, Defendant Sedaghat was aware of – and allowed the use of – his NPI number to secure reimbursement from Medicare and Medicaid for services rendered to patients that Sedaghat never properly encountered.

12.      Defendant **Tony Roberts ("Roberts")** is the Chief Financial Officer ("CFO") at MGH. He is a graduate of University of Arizona with a degree in accounting and he has an MBA

from Ball State University, where he graduated in 2016. Roberts is licensed in Indiana as a certified public accountant; he maintains responsibility for filing, or causing to be filed, the relevant claims for payment to government entities. Through emails, and otherwise, Defendant Roberts was made aware of the fraudulent billing practices alleged herein. He made no effort to engage in proper diligence, return monies to government payors, or engage in conduct that would cease the impropriety.

13.       Defendant **Stephanie Hilton-Siebert ("Siebert")** is the President and Chief Executive Officer ("CEO") at MGH.  She has a diploma in nursing from Missouri Baptist Medical Center School of Nursing and a Master of Science in Nursing and a Bachelor of Science in Nursing from Southern Illinois University. Defendant Siebert was made aware of the wrongful conduct alleged herein; she did nothing to cause it to be stopped, investigated or for corrective action to be taken in the form of returning monies to the government. According to MGH's 2019 Form 990, Ms. Hilton-Siebert received nearly $800,000 in compensation from MGH and related organizations. Accordingly, Defendants wrongful conduct has facilitated an extraordinarily high salary for the leader of a rural health care provider that purports to "transform the health [of] our community through patient-centered, high quality, affordable care."[8] Ms. Hilton-Siebert is well into the top "1%" of income earners in Indiana, which begins with people who earn a salary in excess of $316,000.[9]

14.       **Sarah Seward ("Seward")**, MGH's Director of Risk Management, maintains responsibility for MGH's billing practices. In November of 2020, Seward informed Relator that it is MGH's position that it can bill under a physician NPI number whenever the physician has a

---

[8] *See* https://www.marionhealth.com/about/ (accessed Oct. 28, 2021).

[9] *See* https://www.cnbc.com/2018/07/23/what-it-takes-to-be-in-the-top-1-percent-of-your-state.html (accessed Oct. 28, 2021)

collaboration agreement with a nurse practitioner regardless of whether the physician has any role in patient treatment.

### Complicit Individuals

15. **Karen Jones ("Jones")** is MGH's Director of Human Resources. She has a Bachelor's and a Master's Degree in Education, Business and Health from Ball State University. Since at least December 2020, Jones has known of MGH's wrongful conduct as alleged herein. Rather than protect Relator's right to investigate and report government billing fraud, Jones implemented retaliatory actions including the suspension of Relator as alleged herein.

16. **Barbara Thornell ("Thornell")** is an Employment Relations Manager at MGH. She has an Associate's Degree in Business Administration from Ivy Tech Community College and Secretarial Certificate from Indiana Business College. In her capacity as an MGH Employment Relations Manager, Thornell helped implement – without questioning – the retaliatory suspension of Relator.

## III.   JURISDICTION AND VENUE

17. Relator brings this action on behalf of himself and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 and on behalf of the State of Indiana for violations of the Indiana False Claims Acts.

18. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts relating to Indiana pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

19. This Court has personal jurisdiction over Defendant Marion Health pursuant to 31 U.S.C. § 3732(a), because Defendant can be found in and transacts business in this District. In addition, numerous acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

9

20.     This Court has personal jurisdiction over the individual Marion Health physicians and administrators practicing and working in the State.

21.     Relator's claims are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).

22.     To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this qui tam action based on that information. *Id.*

23.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2), because MGH, as well as other Defendants, can be found in, are licensed to do business in, and transacts or transacted business in this District, and events and omissions that give rise to these claims have occurred in this District.

## IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANT'S FALSE CLAIMS VIOLATIONS

### A.     THE FALSE CLAIMS ACT

24.     The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

10

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

31 U.S.C. § 3729(a)(1).

25.     "Knowing" is defined by the FCA to include "deliberate ignorance of the truth" or "reckless disregard of the truth." *Id.* § 3729(b)(1).

26.     The FCA defines "claim" to include any request for money that:

> is made to a contractor, grantee, or other recipient, if the money … is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> > (I)    provides or has provided any portion of the money or property requested or demanded; or
> >
> > (II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded….

*Id.* § 3729(b)(2)(A)(ii).

27.     For each false claim or other FCA violation, the FCA provides for the assessment of treble damages, plus a civil penalty.[10]

28.     The FCA provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

---

[10] For conduct occurring prior to November 2, 2015, 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. Following that formula, on January 29, 2018, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. As to such conduct, the minimum penalty in the present case is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 83 Fed. Reg. 3945 (January 29, 2018). Subsequent more minor upward adjustments were made to civil penalties for conduct occurring more recently.

**B.** **THE MEDICARE PROGRAM**

**(a)** **Program Overview and Provider Enrollment**

29.     In 1965 Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for certain healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

30.     The federal Department of Health and Human Services, through CMS, administers the Medicare program.

31.     Part A of the Medicare program authorizes payment for inpatient hospital services. *See* 42 U.S.C. § 1395c.

32.     CMS enters into agreements with healthcare providers such as Defendants to participate in the Medicare program. Individuals or entities who are participating providers in Medicare may seek reimbursement from CMS for services rendered to patients who are Medicare beneficiaries.

33.     To enroll as an authorized participant in Medicare, an institutional provider is required to make the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application: Institutional Providers, CMS-855A, at 48.[11]

---

[11] *Available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855a.pdf (accessed Oct. 26, 2021).

### (b)     The Medicare Claims Process

34.     In order to receive reimbursement from Medicare, providers such as Defendants must submit a claim form. *See* Form CMS-1500.[12] That claim form requires the provider to make the following certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete ... 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim ... complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment [and] … 5) the services on this form were medically necessary….

*Id.* at 2.

35.     A provider may also submit the electronic equivalent of this claim form, which includes a substantially similar certification.

36.     CMS guidance as to electronic claims submission is found in Chapter 24 of the Medicare Claims Processing Manual, CMS Publication No. 100-04 (the "Claims Manual").[13] Among other things, the guidance specifies the minimum content of the enrollment form that a local Medicare Administrative Contractor or "MAC"[14] may use to sign up providers to submit claims electronically. Per the Claims Manual, such an enrollment form must contain, and the enrolling provider must acknowledge, at least the following statements:

> The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS' A/B MACs or CEDI:
>
> \* \* \*
>
> 7. That it will submit claims that are accurate, complete, and truthful;

---

[12] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf (accessed Oct. 26, 2021).

[13]*Available    at*    https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf (accessed Oct. 26, 2021).

[14] A MAC is a private insurer awarded a geographic jurisdiction to process medical claims for Medicare beneficiaries. MAC jurisdictions can be found at https://www.cms.gov/files/document/ab-jurisdiction-map-jun-2021.pdf (last accessed Oct. 26, 2021). The current MAC for Indiana is Wisconsin Physicians Service Government Health Administrators.

\* \* \*

12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsified or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law; [and]

\* \* \*

14. That it will research and correct claim discrepancies[.]

Claims Manual, Chapter 24 § 30.2.

37.     The CMS 1500 form requires the physician who signs the form to represent that:

"[i]n submitting this claim for payment from federal funds, I certify that: ... the services on this form were ... personally furnished by me." Under the line, "Signature of Physician (or Supplier)," the individual is also directed to represent: "I certify that the services listed above ... were personally furnished by me." In the Medicare Program Integrity Manual, CMS lists as an example of Medicare fraud, misrepresenting the identity of the individual who furnished the services. *See* Medicare Program Integrity Manual, Ex 27, Section 4.2.1, Rev. 675, effective 12-12-16.

38.     The submission of such a certification, if false, is a violation of the FCA. 31 U.S.C. § 3729(a).

39.     Each such false certification is a separate violation of the FCA.

40.     Exceptions to the requirement that the submitting physician personally furnish services to a covered patient are limited. In the hospital setting, shared or split billing is allowed when two providers (such as a physician and nurse practitioner) from the same group perform a service for the same patient on the same calendar day. In such a case, CMS allows the combined services to be reported under a single provider's name. But CMS has strict criteria governing when split billing is permissible.

41.     Pursuant to Section 30.6.1B of Chapter 12 of the Medicare Claims Processing Manual, the services at issue must be evaluation and management (E/M) services,[15] each provider must have a face-to-face encounter with the patient on the same calendar day, and physician documentation must include an attestation that supports the physician encounter (*e.g.* "Patient seen and examined by me"), the individual with whom the service is shared (*e.g.* "Agree with note by X"), their portion of the rendered service (*e.g.* "Pulse oximetry 94% on room air. Audible rhonchi at bilateral lung bases. Start O2 2L nasal cannula. Obtain CXR"), the date, and a legible signature. NPP (Non-Physician Provider) documentation should include as similar reference to the physician with whom the service is being shared for better charge capture.[16]

42.     Further, Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (a)(l)(A). For most services, a reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. 42 C.F.R. §§ 405.502-504.

43.     For all codes, the medically necessary E/M service and the procedure must be documented sufficiently by the physician or qualified non-physician practitioner in the patient's medical record to support any claim submitted to Medicare for the service and/or procedure. Medicare Claims Processing Manual, Chap. 12 at § 30.6.6(B), Rev. 3873, 10-6-17.

---

[15] For hospitalist programs, critical-care services (99291-99292) are excluded.

[16] *See, e.g.,* https://www.the-hospitalist.org/hospitalist/article/125958/health-policy/medicare-billing-regulations-nonphysician-providers-vary (accessed Oct. 26, 2021); https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf (accessed Oct. 26, 2021).

<u>SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS</u>

**C.   MGH's Physician Collaboration Policy**

44.      Relator began working at MGH as a Hospitalist Nurse Practitioner in March 2020.
He worked at MGH until March of 2021 when he resigned to avoid acquiescing in or ratifying the
unlawful conduct alleged herein.

45.      As a Hospitalist Nurse Practitioner, Relator's duties at MGH included:

- patient admissions/discharges and directing patients to the appropriate unit
  based on diagnosis;

- formulating a plan of care for diverse patients according to evidenced based
  guidelines;

- creating a correct differential diagnosis per patient clinical condition, and
  ordering and interpreting laboratory findings for diagnosis.

46.      The following timeline reflects some of the relevant events alleged in his case:

| | |
|---|---|
| **March 30, 2020**  | Relator became employed by MGH; collaboration agreement with Dr. Khatib effective on or around March 30, 2020. |
| **October 16, 2020** | Khatib circulated a DRG report showing Medicare Inpatient reimbursements for MGH's hospitalists for July 1, 2020 through August 31, 2020; report showed that the reimbursements were overwhelmingly received for care purportedly provided by physicians, when Advanced Practice Providers like Relator had provided the care without physician involvement; *See* DRG Report at ¶ 54. |
| **Mid-October 2020** | Recognizing the problems in this report, Relator began to inquire about the incorrect billing the same day; he emailed Tony Roberts, the CFO, raising the incorrect billing; Roberts then emailed Dr. Khatib and asked him to address the question with Relator. Defendants claimed that the report did not relate to billing. |
| **October 19, 2020** | Relator sent a further email to Khatib, Roberts, Kathy Lawson, Sherree Herres, and Jan Robinson, citing a specific example of a patient he treated. Relator noted that after |



patients he treated were discharged, the attending was then changed to Khatib.

**Late-October 2020**

Dr. Khatib refused to respond further to Relator, looping in Sarah Seward in Risk Management "to have the hospital attorney contact you…" Relator responded that "I am only asking you how do I access my billing in ECW to confirm that all my patients are being billed under me as I am the only one rendering the services, not you."

**December 2, 2020**

Meeting between Relator, Karen Jones and Barb Thornell. At the meeting, Wade raised concerns about improper billing practices. In response, Ms. Jones asked Wade how does a possible billing issue affect his work and pay? Relator responded that Dr. Khatib does not see his patients and there thus should not be billing under his name.

**Late-January 2021**

Relator received billing records from Humana for patients he had seen;

**February 15, 2021**

Relator contacted Humana to request further billing records as part of his effort to investigate MGH's fraudulent conduct;

**March 12, 2021**

Relator met with Sarah Seward, MGH's head of Risk Management and Corporate Compliance and Barb Thornell of Human Resources. Seward called the meeting upon learning that Relator had reviewed patient fee schedules he obtained from the insurer Humana and told Relator that the physician may be billed whenever there is a collaboration agreement. At the end of the meeting, Seward and Thornell suspended relator in retaliation for having reviewed patient and billing records.

**March 28, 2021**

Relator's resignation became effective and his employment at MGH ended.

47.    Consistent with Indiana Administrative Code 848 I.A.C. 5-1-1(a)(7), MGH's nurse practitioners enter into collaboration agreements with hospital physicians to enable them to write prescriptions and perform certain medical services for patients.

48.     At MGH, an inpatient was typically assigned to one attending physician and multiple collaborating nurse practitioners. Relator entered into a collaboration agreement with Defendant Khatib that became effective on or around March 30, 2020.

49.     Pursuant to this agreement, Khatib agreed to "cooperate, coordinate and consult with APN [Wade] in the provision of health care to patients," and enter into a "collaborative protocol." Pursuant to MGH's extensive collaborative protocol, Relator was expected to prescribe medications consistent with the protocols established between Physician and APN, and within the legal limitations of the State of Indiana as well as provide services to patients of the Hospital.

50.     Pursuant to Exhibit D of the Collaboration Agreement, Relator was expected to, among other things, (1) assess health status, illness conditions, response to illness, and health risks of the patients seen in the outpatient, inpatient and long-term care settings; (2) take health histories and perform physical examinations; (3) assess strengths, weaknesses, resources, coping behaviors, and the environment of the patients seen; (4) diagnose actual or potential health problems through data gathered, *i.e.*, lab, radiological, other diagnostic testing performed; (5) develop a treatment plan in conjunction with patient and family, and (6) implement the plan.

51.     Notably, MGH's collaboration agreements confirm that physicians must see patients of their nurse practitioner collaborators in a face-to-face encounter on the day of discharge, but its internal policies do not address the need to have a face-to-face encounter with patients on *any day* they billed for treating patient. Physicians were only required to review the medical record and sign off on the medical record and discuss plan of care with the APN "as necessary."

### D.     THE POLICIES IN PRACTICE

52.     In practice, Khatib and other physicians had no role in the treatment of the patients treated pursuant to the collaboration agreements. Relator learned that other NPs treated their patients independently and autonomously. In violation of Medicare regulations and guidance,

MGH billed for NP services under physician NPI numbers in order to charge a higher rate even though physicians did not maintain, much less document, any face-to-face encounters with patients. Even MGH's written policies were ignored. Physicians did not see the patients of nurse practitioners even on the day of discharge.

53.     Relator first became suspicious of MGH's practices when he reviewed a Diagnosis Related Group ("DRG") report issued in October 2020 that detailed Medicare reimbursements in July and August 2020. Dr. Khatib sent this report, prepared by Kathy Lawson and her team in the finance department, to the Hospitalist department. The Report identified the dollar amount, charges, DRG weight and reimbursement allocated to each medical personnel. Relator noticed that the Report only attributed two patients to him for the period of July 1, 2020 to August 31, 2020 with an expected Medicare reimbursement sum of $11,327.39. By contrast, 75 patients were attributed to Dr. Khatib for an expected reimbursement sum of $473,552.26. This raised a red flag for Relator because it was rare for Khatib to see his own[17] patients not subject to his collaboration agreement with Relator, and he almost never treated or documented treatment for any of Relator's patients in large part because of his administrative roles at MGH. Hospitalist NPs treated all 75 of the patients attributed to Khatib independently and autonomously, and as a result, MGH could not lawfully obtain reimbursement at Khatib's rate for any of these patients who were reflected in the DRG report.

54.     Similarly, NP Carlos Blanchard, who also had entered into a collaboration agreement with Khatib, only received attribution for treating 1 patient. NP Michelle Jones and NP Linda Simpkins were entered into collaboration agreements with Dr. Sedaghat. Jones only received attribution for treating 2 patients between July 1, 2020 and August 31, 2020, and NP

---

[17] Khatib saw only a handful of patients as hospital admissions surged as a result of Covid-19.

Simpkins only received attribution for treating 1 patient during this period. In fact, each NP treated numerous patients each day, and their services were billed under Sedaghat's name. The anticipated amount of Medicare reimbursement for Sedaghat during this period was $503,811.63 per the DRG report. Most or all of the money received was fraudulent.[18]

DRG Report:

**Marion General Hospital**
**Medicare IP - HOSPITALISTS**
**Discharges 07/01/20 - 08/31/20**
**10/16/2020**

| Attending Physician Name (Sort) | Sum Total Charges | Count Visit Number | Average DRG Relative Weight | Sum DRG Expected Reimb. Amount | Sum Length Of Stay |
|---|---|---|---|---|---|
| BLANCHARD,CARLOS M NP-C | 9843 | 1 | 1.8202 | 7361.82 | 1 |
| GUDAPATI,BENERJI MD | 229186 | 8 | 1.2318625 | 48601.52 | 30 |
| HILL,ANTHONY MD | 984632 | 49 | 1.359146939 | 271908.44 | 160 |
| JONES,MICHELLE A APN | 25558 | 2 | 1.6185 | 14510.62 | 8 |
| KANCHERLA,VENKATA K | 1109061 | 56 | 1.2069 | 283840 | 208 |
| KERN,JENA MD | 1185281 | 53 | 1.431241509 | 304114.9 | 213 |
| KHATIB,SIRAJABID MD | 1858982 | 75 | 1.51682 | 473552.26 | 339 |
| MUZOORA,DAPHNE MD | 1090588.3 | 54 | 1.318337037 | 305136.65 | 177 |
| SEDAGHAT,DAVID MD | 2418246 | 56 | 1.791366071 | 503811.63 | 244 |
| SIMPKINS,LINDA APN | 69576 | 1 | 1.462 | 9615.96 | 6 |
| THEERTHAM,MUNI K MD | 293566 | 18 | 1.302461111 | 93273.25 | 59 |
| WADE,CHARLES E NP | 28104 | 2 | 1.527 | 11327.39 | 5 |
| Totals | 9,302,623 | 375 | 1.4351 | 2,327,054 | 1,450 |

55.      Between October 16 and October 21, 2020, Relator transmitted several emails to Khatib and MGH senior management, financial, and billing personnel requesting to see the billing for his patients. Khatib and other MGH personnel initially told him that the issue was an internal

---

[18] Relator believes Sedaghat may have seen some patients during this period and that some portion of this money may be appropriate. This can be discerned by reviewing hospital schedules and the patient records and seeing those where Sedaghat actually documented his presence and treatment.

one, and software glitch, and that the Meditech software used by the hospital was attributing services to Khatib because Khatib was required to sign off on Relator's notes under hospital policy even when not playing any role in treating the patient. Nonetheless, Khatib initially claimed that Wade's independent services to patients were not being billed to Medicare under Khatib's NPI or at Khatib's rate. This was a lie.

56.     Relator's patient charts, discharge summaries, and schedules – juxtaposed against billing documentation showing the claims submitted to Medicare and payment received from Medicare – show that physician NPIs and rate were routinely submitted to and paid by Medicare even though NPs and PAs were the only individuals who treated the patient in face-to-face encounter.

### E.     FURTHER SPECIFIC EXAMPLES OF FRAUD

57.     MGH's fraud is readily discernible by comparing the patient records and schedules to billing submissions and claims documents. The patient records at issue do not depict any services provided by physicians because NPs provided the only service to patients, and physicians played no role in their care.[19]

58.     Strong examples of fraud can be found in the records for the patients treated by Relator in November 2020. Once Relator learned that MGH was changing billing and treating physician information upon patient discharge, Relator pulled progress notes for a number of patients prior to discharge. As their pre-discharge progress notes reflect, Relator was responsible for treating patients C.H., N.L.A., D.L.M., D.C., B.S.T., D.J.C., L.D., J.A.D., N.E.H., and A.A.C.[20]

---

[19] Where only NPs are designated on hospital schedules only NPs provided care. Physicians did not provide care unless they were designated on hospital schedules and the underlying patient records properly document their service. Khatib saw few, if any patients, in November 2020, as evidenced by hospital schedules and the underlying patient records and charts.

[20] Patients are identified here by their initials in order to protect their privacy. Identifiable information has been provided to the Government as part of the Relator's Initial Disclosure.

In these cases, Relator is the sole electronic signatory, and his entry as the treating provider aligns with his designation as the treating provider at the top of the progress notes. Khatib did not see these patients and did not document their condition in any progress notes, and Khatib's electronic signature attesting to treatment does not appear anywhere on any medical document for these patients.

59. Similarly, the hospital schedules emailed by the Nocturnist NP to the Relator reflect that Relator was the treating provider for those patients on the designated day. By way of example, November 2, 2020 schedules reflect that Relator treated A.A.C. for acute respiratory failure in Room CCD 4; D.C. for sepsis in Room CCD 15; D.L.M., N.L.A., and J.A.D. for COVID-19 in rooms 316, 326, and 329 respectively; C.H. for abdominal pain in Room 561; and N.E.H. for intractable pain in Room 562.[21] Each of their individual charts reflect this treatment as well. The schedule for day shift members of the Hospitalist program was emailed to the full Hospitalist team by the night shift nurse practitioners each night.

60. The charts do not reflect any treatment or diagnosis by Khatib. Likewise, there is no electronic signature at the end of the document through which Khatib attested to treating patients in a face-to-face encounter as is the practice at MGH. Nor is Khatib identified as a treating provider on any operative schedules for November 2, 2020. Nonetheless, MGH's billing department re-designated Khatib as the attending physician for these patients and replaced Relator's NPI number with Khatib's number. When submitting claims for reimbursement, Khatib was then identified as the provider, and Medicare was charged at his rate rather than Relator's lesser rate.

---

[21] Daily schedules were provided electronically by date in their original form (word documents) to the Government as part of Relator's disclosure.

61.     Documentation looks different in the rare cases where MGH lawfully billed all NP or PA services under the physician's PI.[22]

62.     Aside from the month of November, Relator did not obtain additional progress notes prior to MGH falsely identifying Khatib as the rendering provider in its electronic system; Khatib accordingly appears as the Attending for other patients treated by Relator exclusively. Nonetheless, patient progress notes and charts, discharge notes, and Hospitalist schedules for these months tell the same story. Wherever Relator is identified as a treating NP on Hospitalist schedules, Khatib played no role in treatment; and, thus authored no progress notes for Relator's patients and did not attest to having treated them through application of an electronic signature. By way of example, discharge summaries[23] and schedules show that Relator treated patient R.J. on August 10, 2020 and August 11, 2020 for respiratory failure and Chronic Obstructive Pulmonary Disease ("COPD") in Room CCD-4.

63.     Relator is the sole electronic signatory and the only individual to document progress. Although Khatib is identified as Attending (Treating Physician) on the discharge documents from which billing numbers were promulgated after manipulation by the billing department, there is no record of his involvement on patient charts, and no schedule exists that depicts his treatment.

64.     Dozens of patient records and schedules from July through December 2020 tell the same story: in each case, the records and schedules document treatment by Relator or another NP

---

[22] In contrast to Relator's November 2020 patients, when physicians actually saw an NP's patients as anticipated by collaboration agreements, accurate documentation reflects the physician treatment and discharge reports contain both the NP and physician's signature. By way of example, patient M.L. was admitted to MGH in October 2020. His chart and his discharge notes reflect treatment by and signatures of NP Christina Robles as well as hospital physician and cardiologist James P. Mackrell, M.D.

[23] Patient discharge summaries reflect date of admission, date of discharge, and progress and treatment during the hospital stay.

alone. But in each case, a physician collaborator was then designated as Attending or provider,[24] and Medicare billed at the physician rate even though the physician played no role in care and did not document participation as Medicare guidance requires.

65.     As the treating NP, Relator obtained claims information for two of his patients from Humana, which, on information and belief, administered their Medicare program.[25] Relator admitted patient S.E. for treatment of COVID-19 on November 21, 2020 and treated him along with fellow NP Linda Simpkins.[26] Although schedules, progress notes, and the discharge show Relator and Simpkins were the only treating medical personnel, MGH billed for S.E. under the NPI of Simpkins's collaborator Dr. Sedaghat. Schedules, progress notes, and discharge notes also show that patient D.A. was admitted on November 30, 2020 to treat COVID-19 infection and was discharged on December 3, 2020. Hospitalist schedules and the patient charts and discharge notes – including electronic signatures – reflect Relator and another NP as the only providers but Khatib is identified as the Attending at the top of discharge chart. MGH also billed for the services provided under Khatib's number and at Khatib's rate.

66.     Humana remittances show that MGH received $15,281 for services provided to D.A. between November 30, 2020 and December 3, 2020. The relevant insurance (designated under plan) is listed as Medicare PPO, and the claim number is 820203440267698. The Rendering NPI number is identified as 1396737524 (id.), which is Khatib's NPI number. See https://npino.com/npi/1396737524-sirajabid-khatib/ (accessed Oct. 26, 2021). Humana remittances also show that MGH received $15,281.90 for services provided to patient S.E. between

---

[24] In MGH's documentation, the rendering provider is referred to as "Attending."

[25] Although these two examples reflect patients whose Medicare plan was administered by Humana, Relator believes this practice was widespread across all plans.

[26] Simpkins took over treatment when Relator's week ended.

November 21, 2020 and November 24, 2020. The relevant insurance (designated under plan) is listed as Medicare PPO, and the claim number is 820203370223740. The Rendering NPI number is identified as 1972584043 (*id.*), which is Sedaghat's NPI number instead of Simpkins' NPI number as should have been the case because she assumed S.E.'s care from Relator. *See, e.g.,* https://npidb.org/doctors/allopathic_osteopathic_physicians/internal-medicine_207r00000x/1972584043.aspx (accessed Oct. 26, 2021).

67.     In violation of split billing rules as detailed in the Claim Manual, MGH received reimbursement at Khatib and Sedaghat's rate even though they played no role in D.A. or S.E.'s treatment. On information and belief, records in the possession of Humana, which reflect all claims submitted by MGH, will show that physicians are designated as the rendering provider in the Hospitalist department nearly exclusively while Relator and other NPs are almost never designated as the rendering provider. Comparing these records to schedules, Progress Notes, and Discharge Notes for the patients identified in these Humana remittances, will reflect that NPs served as the rendering provider and are the only providers appearing on a schedule or who documented progress notes.

68.     In reports known as Sepsis Reports, MGH tracks specific patients that present with the condition sepsis. These reports, which identify patient insurance, age, and payment received by public and private payors, underscore MGH's fraud. For example, the case records for patient W.H. do not show face-to-face encounters with Khatib and only show treatment by Wade, as does Wade's electronic signature at the bottom of the document. Conversely, Khatib is designated as the only treating physician on the Sepsis report, which also shows that Medicare paid $7,536.28 for W.H.'s care.[27]

---

[27] In addition to Relator's evidence of fraud occurring within the hospital at MGH, he also learned of other potentially

**F.    MGH'S FRAUD IS WILLFUL AND ONGOING**

69.    Relator repeatedly raised MGH's fraudulent billing practices with the physicians and other providers in the Hospitalist department, human resources leaders and personnel, and MGH's senior executives. Those individuals include:

- Kathy Lawson in the Finance Office;

- Tony Roberts, Chief Financial Officer;

- Dr. Khatib, Hospitalist Director and MGH Trustee;

- Sherree Herres, Director of Physician Practices;

- Jan Robinson, Assistant Administrative Director, IT Department;

- Sarah Seward, Director of Risk Management;

- Karen Jones, Director of Human Resources;

- Barbara Thornell, Employment Relations Manager;

- Stephanie Hilton-Siebert, President and Chief Executive Officer;

- Linda Simpkins, NP;

- Daphne Muzoora, M.D.

70.    On March 12, 2021, for example, Relator met with Sarah Seward, MGH's head of Risk Management and Corporate Compliance and Barb Thornell of Human Resources. Seward called the meeting upon learning that Relator had reviewed patient fee schedules he obtained from the insurer Humana. She asked why he had done this, and he explained that this was the fourth

---

fraudulent behavior involving Dr. Srikanth, MGH's Chief Medical Officer, member of the MGH Board of Directors, and the physician who oversees nursing home care and serves as collaborator for several nurse practitioners. On information and belief, Dr. Srikanth assigns hospital NPs working with him to see patients located at independent nursing homes in Marion.  In this scenario, the care provided by the NPs is billed with Srikanth as rendering provider while the hospital bills under its NPI to avoid red flags and fraud detection from unusually high patient encounters. Dr. Srikanth has significant administrative responsibilities at MGH and was consistently observed to be working in his office—not seeing patients.  The following individuals are NPs who treated nursing home residents: Riley Rose, Jeffrey Fuller, Jamie Lang, and Betty Geurin.

time he had raised billing fraud issues internally with no satisfactory response or explanation as to why his services were being attributed to a physician that did not see the patient or play any role in treatment. Seward told Relator that the physician may be billed whenever there is a collaboration agreement.

71.     Through this conversation, Relator learned that MGH's practice and position is that it may always bill under the physician NPI number for evaluation and management services rendered exclusively by a nurse practitioner as long as a collaboration agreement exists. MGH takes this approach in the inpatient setting, outpatient setting, and hospitalist program. In contrast, CMS is clear that the physician must see a patient the same day as his or her nurse practitioner collaborator and document the face-to-face encounter with the patient.

72.     After investigation, Relator determined that, in contravention of CMS billing requirements, MGH systematically attributes almost all NP services to physician collaborators even where physicians played no role in patient care. By way of example, most of the purported claims for provision of services by Defendant Khatib submitted to government payors prior to November 2020 are false: Defendant Khatib very rarely saw patients until November 2020 when the increase in demand as a result of increased COVID-19 hospitalizations forced him to begin seeing patients.[28]

---

[28] Relator also learned of an apparently unlawful arrangement between MGH and its contracted Orthopedic Surgery Group, Central Indiana Orthopedics ("CIO"). In what appears to have been an illegal kickback in the form of a non-compensatory benefit to CIO, MGH's Surgical Hospitalist NP Linda Simpkins would admit the CIO surgical patient, provide perioperative and post-operative care and then discharge the CIO patients who had surgery at MGH, rather than that care being provided by a CIO-employed provider. Relator believes that this practice may also have led to excess billing by MGH through the hospitalist department.

Relator was also told by NP Simpkins that the orthopedic surgeon who frequently covered call at MGH, Salil Rajmaira, M.D., was also paid $6,000 for every call day when he was required to appear at MGH for any reason. On information and belief, this amount of daily compensation for call far exceeds the Fair Market Value for these services.

Finally, MGH's physician Dr. Vahid D. Sedaghat may be involved in conduct that violates restrictions on patient referrals. Dr. Sedaghat is the director of a hospice organization called Heart to Heart; he and the organization cross-refer patients, with MGH referring patients to him while he refers his patients to MGH.

V.    **COUNTS**

**COUNT ONE**
**Brought by Relator**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

73.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

74.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

75.    By virtue of the misrepresentations, fraudulent billing, and submission of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to federal government payors for payment for medical care provided exclusively by NPs and PAs without any exception applying that allowed billing at the physician rate, as was represented to the Government to secure payment.

76.    The United States, unaware of the false or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

77.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWO**
**Brought by Relator**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

78.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

79.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

80.     By virtue of the misrepresentations, fraudulent billing, and submission of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used, a false record(s) or statement(s) material to a false or fraudulent claim to federal government payors with regard to medical care provided exclusively by NPs and PAs without applicability of any exception that allowed billing at the physician rate, as was represented to the Government to secure payment.

81.     The United States, unaware of the false or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

82.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### COUNT THREE
### Brought by Relator
### Indiana False Claims and Whistleblower Protection Act,
### Ind. Code §§ 5-11-5.5-2(b)(1)

83.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

84.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*

85.     By virtue of the misrepresentations, fraudulent billing, and submission of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval.

86.     Moreover, by virtue of the misrepresentations, and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

87.     The Indiana Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

88.     By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT FOUR**
**Brought by Relator**
**Indiana False Claims and Whistleblower Protection Act,**
**Ind. Code §§ 5-11-5.5-2(b)(2)**

89.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

90.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*

91.     By virtue of the misrepresentations, fraudulent billing, and submission of non-reimbursable claims described above, Defendants knowingly accomplished these unlawful acts by making, using, or causing to be made or used, a false record or statement to obtain payment or approval of a false claim from the state.

92.     Moreover, by virtue of the misrepresentations, and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

93.     The Indiana Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

94.     By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1 *et seq.*;

b.     Defendants pay not less than $10,781 and not more than $21,563[29] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.     Defendants pay not less than $5,000 and up to three times the amount of damages sustained by the State of Indiana for each and every fraudulent claim for compensation Defendants caused to be submitted in violation of the Indiana False Claims and Whistleblower Protection Act;

d.     The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and Ind. Code § 5-11-5.5-6;

e.     The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and Ind. Code § 5-11-5.5-6;

f.     Defendants be enjoined from concealing, removing, encumbering or disposing of assets that may be required to pay the damages and civil monetary penalties imposed by the Court;

---

[29] As adjusted in accordance with the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 84 FR 13520 (DOJ 2019) (available at https://www.govinfo.gov/content/pkg/FR-2019-04-05/pdf/FR-2019-04-05.pdf) (making final civil penalties set in interim final rule in 2016, *see* 81 FR 42491 (DOJ 2016)).

g.      Defendants disgorge all sums by which it has been enriched unjustly by its

wrongful conduct; and

h.      The United States, the State of Indiana, and the Relator recover such other relief

as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Date: November 8, 2021                                    Respectfully submitted,


/s/Joseph Torres_____
Joseph Torres
joe@karmellawfirm.com
**THE KARMEL LAW FIRM**
20 S. Clark St., Suite 1720
Chicago, IL 60603
Tel: 800-459-6264


*Attorneys For Relator*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Qui Tam Complaint was served upon the following persons on November 8, 2021, via Certified Mail, return receipt requested.

/s/Aaron M. Verosky
Aaron M. Verosky

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

| United States | U.S. Attorney General Merrick Garland<br>United States Department of Justice<br>950 Pennsylvania Ave, NW<br>Washington, DC 20530<br><br>Mr. Andy Mao<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>United States Department of Justice<br>175 N. Street, NE<br>Washington, DC 20002<br><br>Tina L. Nommay<br>Acting U.S. Attorney-N. District of Indiana<br>U.S. Attorney's Office<br>5400 Federal Plaza, Suite 1500<br>Hammond, IN 46320 |
|---|---|
| Indiana | Attorney General Todd Rokita<br>Office of the Attorney General<br>Indiana Government Center South<br>302 W. Washington Street, 5th Floor<br>Indianapolis, IN 46204<br><br>David Cook, Inspector General<br>Office of the Inspector General<br>315 West Ohio Street, Room 104<br>Indianapolis, IN 46202 |